## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS, a federally recognized Indian Tribe, 46575 Road 417 #A, Coarsegold, CA 93614,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA;<br><br>THE UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street N.W., Washington, D.C., 20240;<br><br>KENNETH L. SALAZAR, in his official capacity as the Secretary of the United States Department of the Interior, 1849 C Street N.W., Washington, D.C., 20240; and<br><br>KEVIN K. WASHBURN, in his official capacity as the Assistant Secretary for Indian Affairs, United States Department of the Interior, 1849 C Street N.W., Washington, D.C., 20240,<br><br>Defendants. | Civil No.: 12-2071 |

## COMPLAINT

## INTRODUCTION

1.      Plaintiff Picayune Rancheria of the Chukchansi Indians ("Picayune Tribe") brings this action seeking declaratory and injunctive relief (a) to prevent the United States from taking into trust and holding in trust for the North Fork Rancheria of Mono Indians ("North Fork Tribe") a parcel of land in Madera County, California, pursuant to the Indian Reorganization Act

1

("IRA"), 25 U.S.C. § 465; and (b) to overturn its decision to allow development of a massive off-reservation casino and hotel resort complex on the land pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721.

2.     The proposed casino and resort would be located approximately 36 miles away from the North Fork Tribe's existing trust lands but only approximately 30 miles away from the Picayune Tribe's reservation lands, placing it in direct competition with the Picayune Tribe's existing on-reservation casino.

3.     The Department of the Interior's decisions to take this off-reservation land into trust and to allow gaming on the land violate the Administrative Procedure Act (5 U.S.C. §§ 701-706) ("APA"), IGRA, and the IRA.  These illegal actions will have a devastating economic impact on the Picayune Tribe, whose economic self-determination depends critically on the operation of its on-reservation casino.

4.     The Department of the Interior recognized that to be "[c]onsistent with the scheme established by IGRA," it was required to "apply heavy scrutiny to tribal applications for off-reservation gaming on lands acquired after October 17, 1988," so as "to avoid upsetting the intent of Congress, which favors tribal gaming on existing and former reservations, and on lands acquired in trust prior to October 17, 1988."  But it then determined that allowing a new off-reservation casino to cause severe economic damage to an existing on-reservation casino is *always permissible* because such economic damage is not a legally cognizable harm.  And it made other errors in analysis that separately and jointly render its decision arbitrary, capricious, an abuse of discretion, and not in accordance with law.

## PARTIES

5.      Plaintiff Picayune Tribe is a federally recognized Indian Tribe located in

Coarsegold, California, in Madera County.  The Picayune Tribe owns and operates its

Chukchansi Gold Resort and Casino, a Class III gaming facility, on its reservation lands, which

are located approximately 30 miles from the site of the proposed casino/hotel resort.  Ancestors

of the Picayune Tribe used and occupied lands within the vicinity of the proposed project, and

the Picayune Tribe continues to have a significant cultural connection to the area.  The majority

of the Picayune Tribe's members live in Madera County, and the Picayune Tribe provides

governmental services throughout the County.  Numerous members of the Picayune Tribe have

homes within the vicinity of the site of the proposed casino/hotel resort.

6.      Defendant United States of America is the entity in whose name the land at issue

would be held in trust on behalf of the North Fork Tribe.

7.      Defendant United States Department of the Interior is an agency of the United

States.

8.      Defendant Kenneth L. Salazar is the Secretary of the United States Department of

the Interior, 1849 C Street N.W., Washington, D.C., 20240.

9.      Defendant Kevin K. Washburn is the Assistant Secretary for Indian Affairs of the

United States Department of the Interior, 1849 C Street N.W., Washington, D.C., 20240.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction),

28 U.S.C. § 1362 (jurisdiction over actions brought by Indian tribes arising under the

constitution, laws, or treaties of the United States), and the Administrative Procedure Act,

5 U.S.C. §§ 701-706 (review of final agency action).

3

11.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

12.     The United States waived sovereign immunity from suit under 5 U.S.C. § 702.

13.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2), 1391(e)(1)(A), and 1391(e)(1)(B).  The Defendants include the United States, one of its agencies, and two of its officers, and a substantial portion of the events or omissions giving rise to the claims stated herein, including but not limited to the agency actions challenged here, occurred in this district.

## GENERAL ALLEGATIONS

### The Proposed Off-Reservation Casino

14.     The North Fork Tribe seeks to build an off-reservation casino/hotel resort on approximately 305 acres in Madera County, California, just north of the City of Madera and adjacent to State Route 99 (the "Madera Site").  As yet, the Madera Site is privately owned.  A Las Vegas casino developer, Station Casinos, Inc., is facilitating the Tribe's acquisition of the land in fee; and in the decisions at issue here, the Assistant Secretary for Indian Affairs has agreed to accept the fee land into trust for purposes of gaming.  The Madera Site is located approximately 36 miles from the North Fork Tribe's existing 80-acre reservation held in trust for its benefit by the United States.

15.     The casino/hotel resort that the North Fork Tribe proposes to site, construct, and operate at the Madera Site would consist of, among other things:

- a main gaming hall, with a casino floor of approximately 68,150 square feet, including 2,500 gaming devices, table games, and bingo, and retail space, banquet/meeting space, and administrative space;

- food and beverage services, with fifteen food and beverage facilities, including a buffet, six bars, three restaurants, and a five-tenant food court;

- a multi-story hotel with 200 rooms, a pool area, and a spa; and

- approximately 4,500 spaces for parking, including a multi-level parking structure.

16.     In March 2005, the North Fork Tribe submitted a request to the Department of the Interior to acquire the Madera Site for purposes of building this off-reservation casino/hotel resort complex.

**The Assistant Secretary's Contravention of the Indian Gaming Regulatory Act and Implementing Regulations**

17.     IGRA generally provides that casino-style, or "Class III," gaming "shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988," with limited exceptions.  The only exception at issue here is § 2719(b)(1)(A), which applies only if

> the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination[.]

18.     Although the Department of the Interior's regulations generally limit its consideration of "the surrounding community" and "other nearby Indian tribes" to a 25-mile radius from the proposed gaming facility, the regulations provide that detriment to a "nearby Indian tribe located beyond the 25-mile radius" may be taken into consideration "if it can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment."  25 C.F.R. § 292.2.

19.     Interior's regulations require that it take into account "[a]nticipated impacts on the economic development, income, and employment of the surrounding community," as well as the

5

"[a]nticipated costs of impacts to the surrounding community and identification of sources of revenue to mitigate them."  25 C.F.R. § 292.18(c), (d); 25 C.F.R. § 292.21(a).

20.      Interior's regulations also require that in determining whether § 2719(b)(1)(A) is satisfied, it must consider "[e]vidence of [the tribe's] significant historical connections, if any, to the land."  25 C.F.R. § 292.17(i); 25 C.F.R. § 292.21(a).  Likewise, it must consider, "[i]f a nearby Indian tribe has a significant historical connection to the land, . . . the impact on that tribe's traditional cultural connection to the land."  25 C.F.R. § 292.18(f) ; 25 C.F.R. § 292.21(a). A "significant historical connection" requires either that "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty," or that "a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."  25 C.F.R. § 292.2.

21.      On September 1, 2011, then-Assistant Secretary for Indian Affairs Larry Echo Hawk signed a Record of Decision to "issue a Secretarial two-part determination pursuant to the Indian Gaming Regulatory Act for the Madera site for the North Fork Rancheria of Mono Indians" ("IGRA Decision").

22.      The IGRA Decision admits that the concerns of and detriments to the Picayune Tribe must be considered in determining whether § 2719(b)(1)(A) is satisfied, because Picayune is a "nearby Indian tribe located beyond the 25-mile radius" that "can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment."  25 C.F.R. § 292.2; *see* IGRA Decision at 86. Picayune's comments were "considered" in making the IGRA Decision due to "the relative proximity of Picayune to the [Madera] Site, and the relative proximity of the Chukchansi Gold Casino to the Site," "approximately 39 miles from the Site."  IGRA Decision at 77; *id*. at 85

(considering Picayune's comments because of "the relative proximity of Picayune's lands, headquarters, and existing class III gaming facility to the Site").

23.     The Assistant Secretary correctly determined that such consideration was compelled by law:  "The reality of the economics of class III gaming, tribal government service delivery, and tribal interests in land compels me to accord some weight to Picayune' s concerns in this instance.  Our regulations contemplate such consideration . . . ."  IGRA Decision at 85.

24.     The IGRA Decision also recognizes that "IGRA favors on-reservation gaming over off-reservation gaming," and that "[t]he Department will not approve a tribal application for off-reservation gaming where a nearby Indian tribe demonstrates that it is likely to suffer a detrimental impact as a result."  *Id*. at 86.

25.     The Assistant Secretary nevertheless reasoned, without reference to any statute or regulation, that despite Picayune's showing of direct, significant, and immediate impact, Picayune's comments "must be accorded less weight" than if it were located within a 25-mile radius of the Madera Site.  *Id.* at 85.  This reasoning is an arbitrary and capricious form of double-counting.  It may be inherently more difficult for a more distant tribe to show the same magnitude of harm as a tribe within 25 miles.  But once the harm is shown, there can logically and legally be no further discounting of that harm merely because the Indian tribe is 39 miles away rather than 25.

26.     Proceeding from the faulty reasoning that the Picayune Tribe's proven harms were due less than full consideration, the Assistant Secretary then discounted entirely the devastating loss of revenue that Picayune would suffer from the proposed casino, concluding that "[t]he proposed Resort would not be detrimental to . . . the Picayune Rancheria."  *Id.* at 84.  In so doing, he did not dispute or question the accuracy of Picayune's evidence regarding the likely

magnitude of this loss.  Nor did he disagree that this loss of revenue would cause job losses at

Picayune's casino, or that it would "preclude the Tribe from issuing per capita payments to its

citizens," or that Picayune "government programs will be cut or eliminated due to the loss of

revenues." *Id.* at 86.  Rather, he simply ignored all these harms as legally irrelevant.

27.     The Assistant Secretary incorrectly determined that as a matter of law,

competition-based harm is per se not a cognizable detrimental impact:  "competition from the

Tribe's proposed gaming facility in an overlapping gaming market is not sufficient, in and of

itself, to conclude that it would result in a detrimental impact to Picayune." *Id.*  Under this

reasoning, even a loss of revenue sufficient to destroy reliance interests and potentially

jeopardize ongoing operations entirely would be insufficient to constitute "detrimental impact."

Yet the Picayune Tribe risks such harms given the close proximity of the proposed casino to the

population centers that Picayune must draw from at a distance to remain viable.

28.     The Assistant Secretary also equated Picayune's specific projections of a crippling

amount of lost revenue with a straw man argument that Picayune did not make—the argument

that IGRA "guarantee[s] that tribes operating existing facilities will continue to conduct gaming

free from both tribal and non-tribal competition." *Id.*

29.     Picayune never argued that it should be free from all competition; indeed, the

Secretary acknowledged that "Picayune's Chukchansi Gold Resort and Casino has proven to be a

successful operation in a highly competitive gaming market." *Id.*  Rather, Picayune argued that

the magnitude of losses in this case, due to the proximity of the proposed casino, constituted a

sufficient showing of detrimental impact.

30.     The IGRA Decision contains no reasoning or analysis that would support the leap

from the premise that competitive effects are not automatically a qualifying detrimental impact,

to a refusal to give any weight to the massive economic harm that the tribe will suffer from having its gaming market gutted by a casino whose location is not constrained by historical reservation boundaries.

31.     The Picayune Tribe honored the letter and intent of IGRA by building a gaming facility on its existing reservation, even though its reservation is not the ideal location for such a facility.  The Picayune casino is many miles from major population centers, while the proposed casino on the Madera Site would be very near those same centers.  To allow an off-reservation casino to be built in a location where it will siphon off much of the market from an on-reservation casino, without any regard to those market effects, violates the policies that IGRA is intended to promote.  It renders meaningless the Assistant Secretary's lip-service to the principles that "IGRA favors on-reservation gaming over off-reservation gaming," and that "[t]he Department will not approve a tribal application for off-reservation gaming where a nearby Indian tribe demonstrates that it is likely to suffer a detrimental impact as a result." *Id*. at 86.

32.     Moreover, the Assistant Secretary did not consider whether the losses to the Picayune could be mitigated, reduced, or offset in any manner.  Thus, the Assistant Secretary's reasoning arbitrarily and capriciously treats competitive losses of neighboring Indian tribes' gaming on pre-1988 reservation lands with less regard than other harms caused by the proposed casino.

33.     The IGRA Decision admits that "the Department's regulations require the Secretary to weigh the existence of a historical connection between an applicant tribe and its proposed gaming site as a significant factor" in determining whether § 2719(b)(1)(A) is satisfied. *Id.* at 55.  Yet its analysis and conclusions with respect to both kinds of historical connection are unsupportable.

9

34.     With respect to the first, whether "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty," 25 C.F.R. § 292.2, the IGRA Decision is inadequate on its face and contrary to Congress's own official maps.  The Assistant Secretary purported to link the North Fork Tribe with supposed "predecessors" of the Tribe who "were represented by signatories to the 1851 Treaty signed at Camp Barbour."  IGRA Decision at 57.  But even to assume (incorrectly) that the Camp Barbour treaty boundaries would qualify here as "the boundaries of the tribe's last reservation under a ratified or unratified treaty" would not be enough, because *the Madera Site is outside the boundaries of the Camp Barbour Treaty*, which is treaty 275 in the *Indian Land Cessions in the United States, 1784 to 1894*, U.S. Serial Set, Number 4015, 56th Congress, 1st Session, pp 782-83[1].  It is instead within the boundaries of a different unratified treaty reservation negotiated that same year, the Camp Belt Treaty, number 276[2].

---

[1] Available from the Library of Congress's website at http://memory.loc.gov/cgi-bin/ampage?collId=lIss&fileName=4000/4015/lIss4015.db&recNum=196&itemLink=S?ammem/hlaw:@filreq%28@band%28@field%28DATE+18510429%29+@field%28FLD003+@band%28lIss+c56%29%29%29+@field%28COLLID+lIss%29%29 (last accessed Dec. 30, 2012).

[2] *See* map available from the Library of Congress's website at http://memory.loc.gov/cgi-bin/map_item.pl?data=/gmd370m/g3701m/g3701em/gct00002/ca000007.jp2&itemLink=S?ammem/hlaw:@filreq%28@band%28@field%28DATE+18510429%29+@field%28FLD003+@band%28lIss+c56%29%29%29+@field%28COLLID+lIss%29%29&title=California+1&style=law&legend= (last accessed Dec. 30, 2012).



35.     The Assistant Secretary seems to have been aware of this problem and attempted to elide it by lumping together several different treaties.  He concluded only that "The Site is within the boundaries of the *reservations* set aside for the predecessors of the Tribe *and other Native groups* by the San Joaquin Valley *treaties*."  IGRA Decision at 57 (emphasis added).

36.     Moreover, the linkage between the North Fork Tribe and the Camp Barbour Treaty is facile and unsupported.  The Assistant Secretary merely equates the current Mono Indians with persons referred to as "mona" (lower case) in the Camp Barbour treaty.  There is no evidence to turn this ambiguous term into a reference to the North Fork Tribe.  Any such linkage

11

should be supported by evidence, rather than assuming without support that two words that appear similar refer to the same group of people.  The Assistant Secretary's linkage is in fact incorrect.

37.     With respect to the second, whether North Fork had "demonstrate[d] by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land," 25 C.F.R. § 292.2, the Assistant Secretary's analysis is likewise incorrect.  The Assistant Secretary paradoxically equates migrant or seasonal wage work with "occupancy or subsistence use." IGRA Decision at 57-60.  To occupy or subsist on land is the opposite of working on someone else's land for hire.  The Assistant Secretary also quotes one account that Monos who "inhabit[ed] the higher mountains" would "visit occasionally the plains and water-courses for the purposes of hunting and fishing."  IGRA Decision at 56.  "Visiting occasionally" is not "occupancy or subsistence use."

38.     Thus, the IGRA Decision does not show an adequate basis for a significant historical connection under the Department's regulations, and therefore the decision cannot stand.

**The California Governor's Ineffective Concurrence**

39.     IGRA requires that the Governor of the state in which proposed gaming land is located "concur" with the Secretary's favorable two part determination before a tribe may conduct Class III gaming activities on such lands.  25 U.S.C. § 2719(b)(1)(A).

40.     By letter dated September 1, 2011, Assistant Secretary Echo Hawk informed California Governor Edmund G. Brown, Jr., that he had made a favorable two-part determination on behalf of the Secretary pursuant to authority delegated to him, as required by 25 U.S.C.

§ 2719(b)(1)(A), and requested that, pursuant to applicable state and federal laws, Governor

Brown approve, by his concurrence, the siting and development of the proposed casino/hotel

resort complex at the Madera Site.

41.     On August 30, 2012, in a letter to the Secretary, Governor Brown purported to

approve the siting and development of the casino/hotel resort complex by attempting to issue an

official concurrence.

42.     The Governor, however, failed to follow state law in issuing this purported

concurrence, rendering it ultra vires and void.  By extension, the Secretary's actions in reliance

on the concurrence, including but not limited to the Assistant Secretary's subsequent decision to

take the Madera Site into trust for purposes of gaming, are deficient, and therefore any attempt to

conduct gaming on the Madera Site would be illegal.  Specifically, the Governor violated the

California Environmental Quality Act ("CEQA"), Public Resources Code § 21000 *et seq*., by

issuing his concurrence without first considering the environmental impacts of the project,

preparing and/or considering an environmental study, providing state and local agencies and the

general public with an opportunity to participate in the environmental review process, and

ensuring that all feasible mitigation measures would be applied to the proposed development.

43.     The question of the invalidity of the Governor's purported concurrence is

currently before the courts of California.  On November 30, 2012, the Picayune Tribe filed a

Petition for Writ of Mandate and Complaint for Injunctive Relief  in the Superior Court for the

State of California seeking to set aside the Governor's deficient concurrence decision; mandating

that the Governor comply with CEQA before making any further decisions regarding the

proposed casino/hotel resort; and enjoining state agencies and municipalities from approving any

activities related to the proposed casino/hotel resort until the casino/hotel resort has been subject to legally sufficient CEQA review.

**The Assistant Secretary's Decision to Take the Madera Site into Trust**

44.    On December 3, 2012, the Department of Interior published in the Federal Register a notice of its final agency determination to acquire the Madera site in trust for the North Fork Rancheria of Mono Indians pursuant to the Indian Reorganization Act.  Land Acquisitions; North Fork Rancheria of Mono Indians of California, 77 Fed. Reg. 71,611 (Dec. 3, 2012) ("IRA Notice").  This is a final agency action pursuant to 25 C.F.R. § 2.6 and 5 U.S.C. § 704.

45.    The IRA Notice refers to a November 26, 2012 decision by Assistant Secretary for Indian Affairs Kevin Washburn to accept the Madera Parcel in trust.  In the Record of Decision dated November 26, 2012 ("IRA Decision"), the Assistant Secretary for Indian Affairs determined that the IRA and its implementing regulations were satisfied through compliance with 25 C.F.R. §151.3(a)(3), because the casino planned for the Madera Site makes trust acquisition of the site "necessary to facilitate tribal self-determination and economic development."  IRA Decision at 53.

46.    The IRA Decision is wholly dependent on the prior IGRA Decision and is replete with references to the proposed casino.  For example, the IRA Decision states that

> Pursuant to Section 20 of the Indian Gaming Regulatory Act (IGRA) 25 U.S.C. § 2719(b)(1)(A), on September 1. 2011, the Assistant Secretary–Indian Affairs determined that gaming on the proposed Site in Madera County would be in the best interest of the Tribe and its citizens and would not be detrimental to the surrounding community. The IGRA requires that the Governor concur in the determination which he did by letter dated August 30, 2012. **The land can, therefore, be acquired in trust for the Tribe for the purpose of gaming pursuant to Section 5 of the IRA**, as amended by the Indian Land Consolidation Act of 1983, 25 U.S.C. § 2202.  *Id.* at 1 (emphasis added).

47.     Also, the Assistant Secretary determined that 25 C.F.R. § 151.3(a)(3) was satisfied because revenues from the "gaming resort and hotel complex" will "promote tribal economic development, self-sufficiency, and strong tribal government."  IRA Decision at 53.  No other potential use for the property is relied upon as a basis for the decision.

48.     Therefore, because the IGRA determination is without adequate foundation, the IRA determination must also fall.

## FIRST CAUSE OF ACTION

**DECLARATORY AND INJUNCTIVE RELIEF – INTERIOR'S VIOLATIONS OF THE INDIAN GAMING REGULATORY ACT AND THE ADMINISTRATIVE PROCEDURE ACT**

49.     The Picayune Tribe realleges and incorporates the allegations stated in the preceding paragraphs.

50.     The Department of Interior violated IGRA by failing to properly consider detrimental economic impacts on the Picayune Tribe, in contravention of 25 U.S.C. § 2719(b)(1)(A) and 25 C.F.R. §§ 292.18(f) and 292.21.

51.     The Department of Interior failed to properly consider the North Fork Tribe's lack of historical connection to the Madera Site, in contravention of 25 U.S.C. § 2719(b)(1)(A) and 25 C.F.R. § 292.17(i).

52.     The Department of Interior's IGRA Decision was thereby arbitrary, capricious, an abuse of discretion, and issued in a manner not in accordance with law.  5 U.S.C. § 706(2).

53.     In the absence of injunctive relief, not only will the Picayune Tribe's lawful, on-reservation experience job losses and significantly reduced profits, but the Picayune Tribe's members will suffer irreparable harm when their tribal government, forced to operate on smaller

revenues, must reduce the provision of benefits essential to the health, safety, and welfare of tribal members.

**SECOND CAUSE OF ACTION**

**DECLARATORY AND INJUNCTIVE RELIEF – INTERIOR'S VIOLATIONS OF THE INDIAN REORGANIZATION ACT AND THE ADMINISTRATIVE PROCEDURE ACT**

54.     The Picayune Tribe realleges and incorporates the allegations in the preceding paragraphs.

55.     As relevant here, land may be acquired under the IRA only when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.  25 C.F.R. § 151.3(a)(3).

56.     The Assistant Secretary violated the APA, IGRA, and the IRA by basing the IRA Decision on an invalid IGRA Decision.

57.     The Assistant Secretary violated the APA, IGRA, and the IRA by relying on a purported concurrence from the Governor of California that is ultra vires and invalid under California law.

58.     The IRA Decision and the IRA Notice are thereby arbitrary, capricious, an abuse of discretion, and issued in a manner not in accordance with law.  5 U.S.C. § 706(2).

59.     In the absence of injunctive relief, not only will the Picayune Tribe's lawful, on-reservation casino experience job losses and significantly reduced profits, but the Picayune Tribe's members will suffer irreparable harm when their tribal government, forced to operate on smaller revenues, must reduce the provision of benefits essential to the health, safety, and welfare of tribal members.

## PRAYER FOR RELIEF

WHEREFORE, in accordance with the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2201, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706, the Picayune Tribe respectfully seeks:

1.      A declaration that the IGRA Decision was arbitrary, capricious, and an abuse of discretion, and issued in a manner not in accordance with law, and an order setting aside and vacating such decision;

2.      A declaration that the IRA Decision and IRA Notice were arbitrary, capricious, and an abuse of discretion, and issued in a manner not in accordance with law, and an order setting aside and vacating such decision;

3.      A permanent injunction enjoining the Secretary and his agents and employees from taking the Madera Site into trust or holding the Madera Site in trust for the benefit of the Nation;

4.      An award to the Picayune Tribe of its costs and reasonable attorneys' fees; and

5.      Such other and additional relief as the Court deems just and equitable.

DATED this 31st day of December 2012            Donald R. Pongrace (D.C. Bar #445944)

By: /s/ Merrill C. Godfrey_____
Merrill C. Godfrey (D.C. Bar #464758)
James E. Sherry (D.C. Bar #500797)
Catherine E. Creely (D.C. Bar #982539)
Jessica A. Fitts
Akin Gump Strauss Hauer & Feld
1333 New Hampshire Avenue N.W.
Washington, DC  20036
(202) 887-4000
(202) 887-4288 (facsimile)
dpongrace@akingump.com
mgodfrey@akingump.com
jsherry@akingump.com

ccreely@akingump.com
jfitts@akingump.com

*Attorneys for Plaintiff Picayune Rancheria*
*of the Chukchansi Indians*